KENNETH S. HIXSON, Judge
Appellant Jason Douglas Hensley was convicted in a jury trial of kidnapping, rape, aggravated assault, and aggravated residential burglary. The victim was appellant's estranged wife, Melissa Hensley. For these offenses, Mr. Hensley was sentenced to thirty years in prison.
Mr. Hensley now appeals, raising two arguments for reversal. First, he argues that the trial court abused its discretion in allowing the hearsay testimony of Officer Melissa Smith regarding statements made to her by Mrs. Hensley at the hospital after the attack. Next, he argues that the trial court erred in denying his motion for directed verdict on the aggravated residential-burglary charge. We affirm.
On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. Harris v. State , 2014 Ark. App. 264, 2014 WL 1758697. When an appellant challenges the sufficiency of the evidence on appeal, we address the sufficiency argument prior to a review of any alleged trial errors. Kennedy v. State , 49 Ark. App. 20, 894 S.W.2d 952 (1995). In reviewing a challenge to the sufficiency of the evidence, we determine whether the verdict was supported by substantial evidence, either direct or circumstantial. Armour v. State , 2016 Ark. App. 612, 509 S.W.3d 668. We review the evidence in the light most favorable to the State, considering only the evidence that supports the verdict. Id.
Mr. Hensley and Mrs. Hensley were a married couple going through a divorce. They had separated in November 2015. Before the separation, the parties had arranged to move with their children into a rental house in Conway. Mrs. Hensley and the children subsequently moved into that house, but Mr. Hensley never lived there because of the parties' separation. Mr. Hensley had instead moved into a friend's house in Benton. According to Mrs. Hensley, Mr. Hensley did not have a key to her house, and she had unsuccessfully tried to take his name off the lease. In addition, as a result of charges unrelated to this case, there was a no-contact order entered in November 2015 prohibiting Mr. Hensley from having any contact with one of Mrs. Hensley's children or any of the child's immediate family.
On the morning of February 22, 2016, Mrs. Hensley was home in her bed and her children were at school. The police received an emergency call about a disturbance at the house. Officer Matthew Hugen was one of the officers who arrived to investigate.
When Officer Hugen arrived at the house, Mrs. Hensley was standing outside. Officer Hugen testified that Mrs. Hensley *837 had blood on her clothing and was wearing a handcuff on one of her ankles. She was upset and her voice was fast, shaky, and trembling. According to Officer Hugen, the first thing Mrs. Hensley said to him was that Mr. Hensley had come into the house and tried to attack her with a knife and that she tried to defend herself with a coffee mug.[1]
The police entered the house and found Mr. Hensley in Mrs. Hensley's bedroom lying unconscious on her bed with his pants down around his ankles. There were deep cuts on both of Mr. Hensley's wrists, and the sheets were covered in blood. Upon inspecting the bedroom, the police found a knife, a box cutter, and a still-lubricated condom that appeared to have been recently removed from a torn wrapper. The police also found broken pieces of two coffee mugs. In Mrs. Hensley's kitchen was a knife block with one knife missing. Mr. Hensley had driven his roommate's vehicle and parked a block away before entering the house.[2]
Officer Melissa Smith testified that she made contact with Mrs. Hensley after Mrs. Hensley had been transported by ambulance to the hospital. Officer Smith described Mrs. Hensley as very upset, emotional, and sobbing. Mrs. Hensley had blood on her clothes, hands, arms, and hair, as well as a bruised and swollen cheekbone. As part of her duties, Officer Smith interviewed Mrs. Hensley at the hospital. Mr. Hensley objected to Officer Smith testifying about what Mrs. Hensley had told her in the interview, arguing that this was inadmissible hearsay. The trial court overruled the objection, ruling that her testimony was admissible under the excited-utterance exception to the hearsay rule.
Officer Smith testified:
I did not know this woman [Mrs. Hensley], so I was trying to get the entire story from her. She told me that she and her husband were separated and were in the process of divorce.
She said that they had been separated for a year, and that they really hadn't spoken a whole lot since then but suddenly he started sending her a bunch of text messages, repeating things like he loved her and could not live without her. She said she didn't really respond to him, but the night before the incident he sent her a message saying that he really needed to talk to her, that it was important and that it affected him and the children.
She said she thought that was a very odd statement, so she saved that message but did not reply to it. So she got up that morning, took all the kids and....
She told me that she had been talking on the phone. As soon as she hung up, her husband was at her bedroom door. She had not heard him come in. He was just suddenly there, and he was holding a knife up above his shoulder and he screamed what she described as wildly at her and ran at her and started trying to stab her with the knife.
She said they got in a struggle and she was able to knock the knife away from him, and so he put his hands around her throat and started trying to strangle her. She said she could not breathe at this point and felt like she was going to pass out. She said she was *838 reaching around for anything that she could find to defend herself and she found a coffee mug and smashed it on his head, and that distracted him long enough for her to try and get away.
He caught her before she got out of the bedroom and slammed her against the wall, then he pulled a box knife from his pocket and slit his wrists.
She said they kept struggling and she tried to dart into the bathroom to get away and he followed her in and ended up getting her into the bathtub. Whenever she tried to get away from him, he would smash her head into the bathtub.
The whole time she was telling me this, she is going from being able to talk to almost reliving it and starting to bawl. So, we would have to try and calm her down so she could talk again and explain it and then she would just get into the moment again and start crying. But she was able to relay it to us over time.
She said that he was bleeding really badly because he had slit his wrists and also because of the damage she caused by smashing the coffee mug on his head. At one point she thought "I'll just kind of trick him and say, oh, it's okay, it's okay." Then she started blotting his head with a towel trying to calm him down. After she thought that she had distracted him long enough she tried to run again, but he charged her again and tackled her on the bed.
She said that he had a set of leg shackles. She didn't know where they came from, but he shackled her right leg to her right wrist and he had her on the bed....
He then pulled her pants down. He has her shackled on her wrists and ankle. Pulled her pants down and stuck two fingers into her rectum. That's how she described it.
She said that he tried to have sex with her. She said he was having a difficult time achieving an erection, so he was kind of smushing his penis up against her vagina.
She has five kids, so she told him "If you're going to do this, let's be smart about it. I at least need you to wear a condom." So she told him where the condoms were, and he put it on his penis and began trying to have sex with her.
At that point she said that she felt he was getting tired. She could feel his body weight on her getting really heavy. She knew that he was about to pass out because his eyes were getting glassy, and he was just getting sleepy on her. So, she told him to "Just calm down, just rest, just rest. It's okay." She waited for him to pass out and then ran out of the house.
She mentioned that when he put the shackle on her wrist they were fighting so she kept her hand wide to keep it from getting real tight, so she was able to get that part off of right while she was running and was able to get out of the house.
Tyler Henderson, a friend of Mrs. Hensley, had driven up to Mrs. Hensley's house in the aftermath of the incident. Mr. Henderson testified that he saw Mrs. Hensley exit the front of the house wearing pajamas and no shoes and noticed blood on Mrs. Hensley's clothing and hair. According to Mr. Henderson, Mrs. Hensley was panicked and yelling, but he could not understand anything Mrs. Hensley was saying. When the first responders arrived and tried to examine Mrs. Hensley, she recoiled and screamed and would not let them examine her.
Mrs. Hensley testified in detail about the events that occurred that morning. She stated that her doors were locked and that she was lying in bed when Mr. Hensley *839 entered her bedroom. Mrs. Hensley testified:
He appeared in the doorway of my bedroom with a kitchen knife and I started screaming. I was yelling at him to get, to leave, that he was not welcome and to go away.
He was yelling at me, I couldn't understand all of it, but he was yelling and saying he was there to kill me and kill himself.
I was already under the covers in the bed, and he jumped on me with the knife and held it to my throat. I grabbed it by the handle and as I pulled it away from my face it hit my arm, I still have a scar from it, and it hit the back of the headboard and fell behind the bed.
He then started choking me with his hands around my throat. I don't recall him saying anything while he was choking me....
At some point I grabbed a coffee cup. While he was choking me, I grabbed a coffee cup and hit him over the head with it. I kept just grabbing things to hit him over the head, hoping to knock him out.
After I got out of the choke hold I maneuvered my legs out from underneath him and the covers so that I could get out - get off the bed and out from underneath so I wouldn't be pinned down.
As I did that he grabbed me by the hair and slammed me up against the wall. The next thing I knew he pulled out a pair of handcuffs and was beating me over the head with them, and I was on the ground holding my hands over my head.
He was yelling and telling me to stop screaming - that if I stopped he would stop hurting me. So, I told him "Okay, okay, just please stop. Please stop hurting me. Why are you even here?"
Then he pulled a box cutter out of his pocket. I didn't know what he was going to do with it, but he started cutting his wrists, both of them, very deeply. Blood was going everywhere.
I thought I was going to die. I kept telling myself to keep fighting. I yelled at him and told him that if he was going to be selfish enough to cut his wrists and bleed everywhere he could at least do it in the bathroom and bleed in the bathroom, so I didn't have to clean up his mess.
That's when he grabbed my hair again and shoved me into the bathroom and tried to shackle me. I kept asking him not to do this, not to leave me in there like that. He told me that as long as I stayed in the bathroom he would not shackle me to the bathtub and then he walked out and closed the door.
I was just trying to figure out how to get out of there. I kept trying to leave the bathroom and he kept pushing me back and threatening to beat me, or cut me, or kill me.
Then he shut the door and I could hear him rummaging around the bedroom, looking for his cell phone. Then he came back into the bathroom with two bottles of medicine that were prescribed to me. One was an almost full bottle of Ambien and the other was an almost full bottle of Klonopin. I had only taken a few of those and they were on my dresser. He dumped them all into some container and then took all of them and drank some water.
I was sitting in the bathtub during all of this, just trying to keep my distance.
He was still bleeding, and he told me to just stay right there. Then I thought, "okay, I'm a nurse. He's bleeding out. He's taken a bunch of pills. At some point he is going to get tired from the *840 blood loss and medication and he will lose his strength and his ability to keep going."
He then came back into the bathroom with a package of condoms and asked me why I needed those. And I said, "well why would anybody need condoms?" He said "Fine. If you want to f* * * other men, then I'm going to take you in here and I'm going to f* * * you too."
He grabbed me by the hair and took me into the bedroom and we were physically fighting because I was trying to get him off of me. I'm hitting him, punching and scratching him. I grabbed the other two coffee cups and beat him over the head with those as well. I just thought that if I was going to die and if he was going to rape me then I wanted his DNA under my fingernails, so someone could find out who did this to me.
He then pulled out the cuffs he had, and we fought over that because he was trying to put both my hands behind my back and had me face-down in the bed. I was trying to roll around and just keep moving. I thought if I kept moving he wouldn't be able to get the cuffs on me, but he managed to get one on my right ankle and the other on my right hand.
He pulled his pants down and then pulled mine down and I was begging him not to do this. He put his fingers into my vagina and in my anus and I told him that if he was going to rape me to use a condom because I already have five children and don't want anymore.
He grabbed a condom and tried to put it on. He tried to rape me with his penis, but he wasn't able to maintain a full erection.
I realized he was getting tired, and that the meds he took may have started kicking in, or the blood loss may have affected him enough that he was losing strength and his ability to stay awake. I asked him if he was tired and told him that it was okay if he was tired - that he could just lay down. He said that he was tired, and I had to roll him off of me.
I was standing there, scared that he was going to get back up again and start hurting me. When I realized he was out, I pulled up my pants and started running out the door.
I saw my friend Tyler when I ran out the door. He was really shocked. Honestly, I didn't expect him to show up right then. I was going to run across the street to the neighbors to call the police, but Tyler got me in the car and I was "just go, get me out of here" because I was terrified he would come back outside the house. Eventually the fire department and police arrived.
Mr. Hensley testified in his own defense. He stated that on the morning of the events he had decided to kill himself and needed to see Mrs. Hensley once more before he took his life. He stated that he drove his roommate's vehicle to her house because his car had a broken headlight and he did not want to get pulled over and get a ticket. Mr. Hensley claimed that he entered Mrs. Hensley's house through an unlocked door and went to her bedroom, at which point she became hysterical and started throwing coffee cups at him and screaming for him to leave. Mr. Hensley testified that Mrs. Hensley grabbed a knife from her nightstand and swung the knife at him, and that he was able to wrestle the knife away from her. He stated that during the struggle he noticed a pair of handcuffs on the bed and used them to shackle Mrs. Hensley's right wrist and right ankle to keep her from swinging at him. According to Mr. Hensley, he then told Mrs. Hensley that he had no life, produced a box cutter from his pocket, and slit his wrists. Then he took a bunch of *841 pills. At this point, according to Mr. Hensley, Mrs. Hensley hugged and kissed him and asked if he wanted to have sex. He then pulled out a condom and tried to have sex but could not get an erection. Soon thereafter, he started feeling sick and passed out.
The State presented one rebuttal witness. Officer Jeremy Holliman testified that he had interviewed Mr. Hensley about these events and that Mr. Hensley agreed to give a statement. According to Officer Holliman, Mr. Hensley told him that he went to Mrs. Hensley's house because he needed to talk with her. Mr. Hensley told Officer Holliman that when he entered the house "it went horribly," and Mrs. Hensley threw coffee mugs at him and screamed for him to leave. Mr. Hensley told Officer Holliman that the right thing to do would have been to leave, but that he remained there and "coerced her into the bathtub so he could get out of the situation." Mr. Hensley said that the handcuffs belonged to Mrs. Hensley's boyfriend and that he put them on her to make her listen to him. Mr. Hensley never mentioned anything about Mrs. Hensley hugging or kissing him, and when asked whether they had sex he replied, "absolutely not."
We first address Mr. Hensley's argument on appeal that the trial court erred in denying his motion for directed verdict on the aggravated residential-burglary charge. Arkansas Code Annotated section 5-39-204 (Repl. 2013) provides:
(a) A person commits aggravated residential burglary if he or she commits residential burglary as defined in § 5-39-201 of a residential occupiable structure occupied by any person, and he or she:
(1) Is armed with a deadly weapon or represents by word or conduct that he or she is armed with a deadly weapon; or
(2) Inflicts or attempts to inflict death or serious physical injury upon another person.
Arkansas Code Annotated section 5-39-201(a)(1) provides that a person commits residential burglary if he enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing in the residential occupiable structure any offense punishable by imprisonment.
Mr. Hensley contends that there was insufficient evidence to support his aggravated residential-burglary conviction because his name was on the lease of the house that he entered. Arguing that he had the right to use and possession of the property, he asserts that the State failed to prove that he entered or remained unlawfully in the residence of another person as required by the statute.
We are unable to reach the merits of Mr. Hensley's sufficiency argument because it is not preserved for appeal. Although Mr. Hensley made directed-verdict motions at the close of the State's evidence and at the close of his case, he failed to renew his directed-verdict motion after the State called Officer Holliman as a rebuttal witness. Rule 33.1(a) of the Arkansas Rules of Criminal Procedure provides that, in a jury trial, a motion for directed verdict shall be made at the close of all the evidence. The failure to challenge the sufficiency of the evidence at the times and in the manner required constitutes a waiver of a sufficiency-of-the-evidence argument on appeal. Ark. R. Crim. P. 33.1(c). Failure to renew a motion for directed verdict after the close of the State's rebuttal testimony waives the issue of sufficiency of the evidence on appeal. Garza v. State , 2018 Ark. App. 422, 558 S.W.3d 404. A renewal is more than a matter of mere form; it goes to the substance of the evidence *842 against a criminal defendant. Id. Because Mr. Hensley failed to renew his motion for directed verdict at the close of the State's rebuttal testimony, he has waived any challenge to the sufficiency of the evidence on appellate review.
Mr. Hensley's remaining argument is that the trial court erred in permitting the hearsay testimony of Officer Smith regarding the statements made by Mrs. Hensley at the hospital. The trial court permitted this testimony based on the excited-utterance exception to the hearsay rule. Arkansas Rule of Evidence 803(2) provides that an excited utterance is not excluded by the hearsay rule, even though the declarant is available as a witness, and that an excited utterance is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. Mr. Hensley maintains that at the time Mrs. Hensley made these statements she had been removed to the hospital and was no longer under the stress of excitement caused by the events, and that this exception was not applicable.
We discussed the excited-utterance exception in Jones v. Currens , 104 Ark. App. 187, 192, 289 S.W.3d 506, 510-11 (2008):
The theory of the excited-utterance exception is simply that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication. In ruling on this exception, the circuit court should consider all the relevant circumstances: the lapse of time between the events and the statement; the declarant's age, mental condition, and physical condition; the characteristics of the event; and the statement's subject matter. The record must show that the declarant's condition at the time was such that the statement was spontaneous, excited, or impulsive rather than the product of reflection and deliberation.
The statement need not be contemporaneous with the provoking event. But the statement must be close enough in time that it may reasonably be considered a product of the stress of the accident, rather than of intervening reflection or deliberation. The trend in the law is toward relaxing the time element. Nonetheless, an excited utterance must have been made before there was time to contrive and misrepresent; that is, it must have been made before reflective and deliberative senses took over.
(internal citations omitted).
The decision to admit or exclude evidence is within the sound discretion of the trial court, and this court will not reverse a trial court's decision regarding the admission of evidence absent a manifest abuse of discretion. Jones v. State , 2011 Ark. App. 324, 384 S.W.3d 22. An abuse of discretion is a high threshold that does not simply require error in the trial court's decision, but requires that the trial court acted improvidently, thoughtlessly, or without due consideration. Id. Moreover, an appellate court will not reverse a trial court's evidentiary ruling absent a showing of prejudice. Id.
The statements made by Mrs. Hensley to Officer Smith about the events that occurred that morning were clearly hearsay, and we conclude under these circumstances that the trial court abused its discretion in applying the excited-utterance exception. In this case, Mrs. Hensley's statements at the hospital were made after she had already spoken about the crime to another officer at the crime scene. Though not dispositive, there was a time lapse between the startling events and the time Mrs. Hensley spoke with Officer Smith. Moreover, Mrs. Hensley's statements were not spontaneous; rather, they were in response *843 to questions in an interview by the officer. And the statement itself was quite lengthy and could better be described as a narrative than an utterance. We hold that the trial court abused its discretion in admitting this testimony.
This, however, does not end our analysis because evidentiary rulings are subject to a harmless-error analysis. Our supreme court has held that even when an appellant has demonstrated error, when the evidence of guilt is overwhelming and the error is slight, we can declare the error harmless and affirm. Bledsoe v. State , 344 Ark. 86, 39 S.W.3d 760 (2001). Our supreme court has also held that prejudice is not presumed and that no prejudice results when the evidence erroneously admitted was merely cumulative. Wright v. State , 368 Ark. 629, 249 S.W.3d 133 (2007).
We hold that Mr. Hensley has failed to show that the trial court's error resulted in prejudice. Officer Smith's testimony was cumulative to the testimony of Mrs. Hensley, who testified in great detail about the offenses committed against her by Mr. Hensley that morning. Officer Smith's testimony was also consistent with the testimony of Officer Hugen, who testified that shortly after the events occurred, Mrs. Hensley, while in a condition of excitement, told him that appellant had attacked her with a knife and that she tried to fight him off with coffee mugs. In addition, there was other evidence corroborative of Mr. Hensley's guilt. There was evidence that Mr. Hensley exercised unauthorized control of his roommate's vehicle and handcuffs, that he parked a block away from Mrs. Hensley's house, which was locked at the time, and that he entered the house. Sometime later, Mrs. Hensley emerged from the house in bare feet and pajamas, with blood on her hair and clothes, in a state of panic. A handcuff remained attached to her ankle, undisputedly put there by Mr. Hensley. Mrs. Hensley was transported to the hospital by ambulance for treatment of her injuries. Mr. Hensley was found unconscious on Mrs. Hensley's bed with his pants down and a condom nearby. Considering Mrs. Hensley's testimony and the remaining evidence demonstrating Mr. Hensley's guilt, we hold that the error in admitting Mrs. Hensley's statement to Officer Smith was harmless.
Affirmed.
Klappenbach and Whiteaker, JJ., agree.

Mr. Hensley made a hearsay objection to these statements by Officer Hugen, but the trial court ruled them admissible under the excited-utterance exception. This evidentiary ruling is not at issue on appeal.

Mr. Hensley's roommate testified that Mr. Hensley had taken his vehicle, as well as a pair of his handcuffs, without his permission.